UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
JOSEPH NAVAN,                                   :
                               Plaintiff,    :    **OPINION AND ORDER**
                                              :    **GRANTING**
       -against-                            :    **DEFENDANT'S MOTION**
                                                :    **TO DISMISS**
MICHAEL J. ASTRUE, Commissioner of the          :
Social Security Administration,                 :    06 Civ. 2757 (AKH)
                                                     :
                             Defendant.    :
                                                   :
------------------------------------------------------------------ x
ALVIN K. HELLERSTEIN, U.S.D.J.:

        Plaintiff, Joseph Navan ("Navan"), brings this action pursuant to 42 U.S.C. § 405(g). Navan seeks review of the Social Security Administration's ("SSA") final determination that he was not disabled within the meaning of the Social Security Act between May 13, 1997 and December 31, 1999, the last date upon which Navan was entitled to disability insurance benefits ("DIB"). The Defendant in this case, the Commissioner of Social Security, has moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings. I find that the Commissioner's determination is supported by substantial evidence and, accordingly, grant the Commissioner's motion and dismiss the Complaint.

## I. Background

        Joseph Navan, born April 5, 1961, obtained his GED and joined the New York City Police Department ("NYPD") in July 1984. Tr. 113-22.[1] In September of 1992 Plaintiff sought treatment for persistent neck and back pain that he began experiencing following a motor vehicle accident on September 28, 1992, when his jeep, after losing a rear wheel, nearly flipped. Tr. 204. The examining physician's initial assessment was that the impact of the accident had

---

[1] Citations refer to the transcript of the Hearing of September 1, 2005, included as part of the certified copy of the transcript of the record, provided by Defendant as required by 42 U.S.C. § 405(g). [Hereinafter Tr.].

resulted in cervical radiculopathy[2], lumbosacral radiculopathy and severe myofascial pain syndrome. [3] Tr. 205.  Plaintiff remained on the police force for just over two years following the accident, but states that he was assigned to light duty, which primarily involved answering phones. Tr. 438.  In September of 1993, Plaintiff underwent an L4-L5 laminectomy[4] at New York Hospital. Tr. 234-49.  One year later, in September of 1994, plaintiff applied for Ordinary Disability Retirement, which was granted by the NYPD on October 10, 1994.  In his application Navan stated that he had not experienced sufficient relief following the 1993 surgery to allow him to return to "full duty police work." Tr. 210.  Plaintiff has not worked in any gainful capacity since retiring from the police force in October 1994. Tr. 466.  On March 13, 1995, Plaintiff was admitted to New York Hospital for a second surgery and underwent a partial laminectomy on L4, L5 and S1.  Tr. 213-22.

     Plaintiff filed an application with the SSA for DIB on July 18, 1996, alleging disability since November 9, 1994 due to severe and constant pain arising as a consequence of the injury suffered in the 1992 accident. Tr. 84. This application was denied on September 9, 1996. Tr. 34-36.  The denial notice stated that Navan's failure to take a medical examination, scheduled and paid for by the SSA, prevented a full evaluation of his condition. Tr. 36.  Navan filed a request for reconsideration on March 11, 1997, and was informed on May 12, 1997 that his claim had been denied upon reconsideration. Tr. 44.

---

[2] Radiculopathy, also referred to as sciatica, describes pain emanating from the spinal nerve roots, most often resulting from a herniated disc.  Irritation of the spinal nerve root may result from contact with the gelatinous substance leaking from a ruptured disk or from compression produced by the disc rupture.  Lumbosacral radiculopathy refers to an occurrence of the problem at the lumbosacral joint, L5-S1, while cervical radiculopathy implicates the cervical vertebrae.

[3] Myofascial pain, commonly known as muscle pain, is a chronic condition that affects the fascia (connective tissue that covers the muscles).

[4] A laminectomy is a surgical procedure in which the lamina of the vertebra is removed or trimmed to widen the spinal canal and create more space for the spinal nerves. L4-L5 describes the two lowermost vertebrae of the lumbar spine (lower back).  S1, referred to later in this paragraph, describes the uppermost segment of the sacrum, which is a series of 5 bony segments fused together (known as S1 to S5) that create a triangular-shaped bone that serves as the base of the spine. S1 and L5 are adjacent.

Plaintiff filed a second application for DIB on November 23, 2002, also alleging an onset date of November 9, 1994. Tr. 88-91. In this second application, the denial of which forms the basis of the present action, Navan alleges that his pain presents him with great difficulty in performing everyday tasks such as walking short distances, taking a shower and going to the bathroom. Tr. 465-466. Additionally, Navan claims that, aside from a short period of relief following the 1995 surgery, his condition has remained unchanged since November 1994. Tr. 465.

**A**. *Medical Evidence*

*1. Records prior to May 13, 1997*

An x-ray of Navan's cervical spine taken on September 29, 1992, the day after his accident, showed mild degenerative changes involving the uncinate processes[5] of the 4th, 5th and 6th cervical vertebrae. Tr. 164. The x-ray also showed minimal narrowing of the neural foramina[6] between the C4-C5 neural vertebra. Tr. 164. The report noted that there was no evidence of fracture or dislocation. Tr. 164.

Between September 30, 1992 and August 17, 1994, Dr. Anthony Infantino examined Navan on several occasions. Tr. 177-205. Dr. Infantino initially diagnosed Navan as suffering from cervical radiculopathy, lumbosacral radiculopathy and severe myofacial pain syndrome, prescribing 400 mg of Motrin four times daily and physical therapy. Tr. 205. An MRI of the lumbar spine, ordered by Dr. Infantino, performed on October 10, 1992, revealed a moderate size central herniation at L4-L5[7] with effacement of the anterior aspect of the dural sac.[8] Tr. 203. The MRI also indicated that Navan suffered a small, left-sided disc herniation at L5-S1, without

---

[5] The uncinate processes are bony, hook-like parts of a vertebra that prevent it from sliding backwards off the vertebra below it.
[6] Nueral Formina refer to an opening between a pair of vertebra that allows for the passage of the spinal cord.
[7] A herniation at the L4-L5 indicates a herniation of the disc between the L4 and L5 vertebrae.
[8] The dural sac is the membranous sac that encases the spinal cord within the bony structure of the vertebral column.

3

evidence of nerve root compression. Electrodiagnostic studies ("EMGs") conducted by Dr. Infantino in November of 1992 confirmed the diagnosis of lumbosacral radiculopathy. Tr. 202. A note written by neurosurgeon Dr. John B. Robbins on December 4, 1992 stated that Navan would be unable to return to work until further notice due to a lumbar sprain and lumbar radiculopathy. Tr. 175.

On March 6, 1993, Navan reported to Dr. Infantino that his pain had worsened in recent months. Tr. 197. Dr. Infantino performed a second series of electrodiagnostic studies and noted a worsening of Navan's condition since the test performed in November 1992. Tr. 196. Dr. Infantino referred Navan back to Dr. Robbins who ordered a CT scan that was performed on May 25, 1993. Tr. 173. Dr. Robbins reported that the scan showed the presence of a disc herniation at L4-L5 centrally, with no evidence of root compression or amputation. Tr. 173. In May 1993, Dr. Martin Barschi conducted an independent orthopedic medical evaluation that included a review of Navan's medical records. Tr. 165. Dr. Barschi concluded that Navan was suffering from significant radiculopathy and neurological loss in the lower extremities resulting from a herniated disc injury at the L4-L5 area and that surgical correction was indicated. Tr. 167. Dr. Barschi further noted that he expected the patient to have a permanent *partial* disability. Tr. 167.

Dr. Francis Gamache performed an L4-L5 partial laminectomy and excision of an L4-L5 herniated nucleus pulposus ("HNP")[9] on Navan on September 23, 1993. Tr. 243. Medical records from the period between September 1993 and March 1995, including MRIs conducted in December 1993 and August 1994, suggest that Navan did not obtain significant relief from the 1993 surgery and continued to suffer from recurrent disc herniation. Tr. 211, 183. A physiatric

---

[9] Herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain and nerve root irritation.

4

evaluation completed by Dr. Infantino on March 21, 1994 noted positive straight-leg raises[10] at fifteen degrees, "much pain standing on heels and toes," and diagnosed recurrent herniated nucleus pulposus in the lumbosacral area, severe lumbosacral radiculopathy, and severe myofacial pain syndrome. Tr. 187-90.  A handwritten prescription form from Dr. Allen Chamberlain, dated September 19, 1994, stated that Navan was totally disabled as a result of an L4-L5 HNP. Tr. 209.

On March 13, 1995, Dr. Gamache performed a second surgery on Navan, again consisting of an L4-L5 partial laminectomy and excision of a L4-L5 HNP. Tr. 214.  An orthopedic re-evaluation conducted by Dr. Barschi on January 14, 1996, indicated that although Navan was still experiencing chronic pain, the 1995 surgery had significantly improved and otherwise stabilized his condition. Tr. 254-56.  Dr. Barschi noted, however, Navan's complaint of constant soreness in his back and lower legs and observed that flexion of the lumbosacral spine in the standing position was limited to 30 degrees. Tr. 255.  But compared to Dr. Infantio's evaluation conducted in March of 1994, Dr. Barschi's notes from January of 1996 showed clear post-surgical improvements, reporting that Navan, walked with a normal gait, was able to stand on his heels and toes actively, and perform straight-leg raises to 60 degrees.  Tr. 255. Additionally, the report indicated that sensation and motor power of the lower extremities were intact. Tr. 255.  Dr. Barschi assessed Navan as having a permanent *partial* disability, which rendered him permanently disabled from his previous job *as a police officer*.

On March 6, 2007, Dr. Barry Erner conducted an examination of Navan and, without making any assessment of his functional limitations, diagnosed Navan as suffering from post-laminectomy syndrome[11] and lumbar radiculopathy.

---

[10] Straight-leg tests are used to gauge the level of lumbosacral nerve root irritation.  The patient, lying on his back, is asked to raise one leg - knee absolutely straight - until pain is experienced in the thigh, buttock and calf.
[11] Post-laminectomy syndrome refers to chronic back and/or leg pain that occurs after back (spinal) surgery.

5

*2. Records from May 13, 1997 to December 31, 1999*

There are no records in the transcript to indicate that, following his 1995 surgery, Navan sought or received any medical intervention for his back problems. The only evidence of any tests or treatment performed on Navan between May 13, 1997 and December 31, 1999 is a report completed by Dr. Michael Adler on March 21, 2003. Tr. 270-73. The report indicates that Navan had a series of x-rays on his knees, feet and back on June 18, 1999, which showed some disc space narrowing between the L4-L5 vertebra and between the L5-S1 vertebra. Tr. 272.

*3. Records subsequent to December 31, 1999*

It was not until six years after his 1995 surgery, in August 2001, when Navan began again to receive treatment for his back pain, this time at the South West Florida Pain Center ("SWFPC"). Tr. 325. SWFPC's treatment records indicate that, between August 2001 and October 2002, Navan's back pain, which ranged from three to five on a scale of ten, was effectively managed with medication and exercise, which included use of a universal weight machine. Tr. 318-25. However, SWFPC's records for Navan from November 2002 through June 2003 demonstrate a worsening of his condition, recording pain levels between six and eight, controlled only through medication. Tr. 310-316.

The transcript contains a multitude of records relating to the diagnosis and treatment of Navan's spinal condition from 2003 to 2005. Included in these records are reports of previously unseen symptoms, including nerve root impingement and nerves diverted across an L4-5 disc bulge. Tr. 279, 294-97, 346-48. In May of 2003, treating surgeon Dr. Gregory Flynn opined that Navan could stand a maximum of one hour, walk no more than three-hundred feet before needing to sit and relieve the pressure on his back, do no climbing, and lift a maximum of fifteen pounds. Tr. 341. Dr. Flynn performed several procedures on Navan between 2003 and 2005, including spinal endoscopy with anesthetic, steroid injection on March 16, 2003, Tr. 265,

6

discography on April 24, 2003, Tr. 363, discography, CT holographic reconstruction and epidurography on June 15, 2004, 359-65, nucleoplasty and discectomy on July 18, 2004, Tr. 356, and spinal endoscopy and nuerolysis on March 31, 2005, Tr. 353.

Dr. Leonard Langman examined Navan on August 18, 2005 and reported that EMG studies performed on August 9, 2005 showed L4-L5 and L5-S1 radiculopathy that rendered Navan totally and permanently disabled. Tr. 444.  At the September 1, 2005 hearing, Dr. Langman also offered the retrospective opinion that, from the 1992 accident onwards, Navan continuously suffered a herniated nucleus propulsis. Tr. 470.  Langman further contended that the EMGs conducted in August 1994 and August 1995 were consistent with his 2005 diagnosis of total disability due to radiculopathy. Tr. 472.  His testimony did not consider the apparent improvements in Navan's condition following Dr. Gamache's surgery of March 13, 1995, and the medical examinations performed that year and the next, nor the absence of further medical examinations until August 2001.

**B.**  *Administrative Proceedings*

*1.  Previous application for DIB*

Navan applied for DIB on July 18, 1996, claiming eligibility for DIB under Title II of the Social Security Act. Tr. 84.  In his application Navan stated that he became unable to work because of his disabling condition on November 9, 1994. Tr. 84.  On August 30, 1996, Navan was notified that his claim had been denied. Tr. 34.  The SSA explained that the determination was based on an evaluation of the following evidence:  Dr. Barschi's January 14, 1996 report, Dr. Gamache's March 17, 1995 report, Dr. Anthony Infantino's August 17, 1994 report, records from the New York Hospital Cornell Medical Center for the period March 12-14, 1995, and the New York City Police Department report of October 4, 1994. Tr. 36.  The SSA indicated that the evidence did not show that Navan was disabled and further cited Navan's failure to take the

7

medical examination, which the SSA had requested, and for which, it had promised to pay. Tr. 36; 20 C.F.R. § 404.1517 ("If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability…, we may find that you are not disabled...").

Exercising his right under 20 C.F.R. § 416.1409, Navan filed a request for reconsideration of the SSA's initial determination of his claim. Tr. 44-46. On May 12, 1997, the SSA notified Navan that his claim had been denied upon reconsideration. Tr. 44-46. The SSA stated that in addition to the records available for the initial determination, the state agency that reviewed the claim was also provided with a March 6, 1997 report by Dr. Barry Erner. Tr. 46. Navan was advised that while the SSA recognized that pain and stiffness prevented him from performing certain types of work, the record indicated that the 1995 surgery had stabilized Navan's condition and that, based on his age, education and work experience, Navan could perform "medium work." Tr. 46. In reaching this determination, the SSA relied on the assessment of state agency medical consultant Dr. W. Wells. Tr. 262-69; 20 C.F.R. § 416.946 ("When a State agency makes the disability determination, a State agency medical or psychological consultant(s)… is responsible for assessing your residual functional capacity.").

The SSA's denial letter also advised Navan of his right, under the Social Security Act, to request a hearing before an administrative law judge ("ALJ") if he believed the reconsideration determination was incorrect. Tr. 44. The letter explained that the request for a hearing must be made within 60 days and that failure to file an appeal could result in the denial of a new application if the facts and issues were the same. Tr. 44. Additionally, as discussed *infra*, Navan was advised that the regulations entitled him to attempt to show good cause for reopening his

8

case in a subsequent application for DIB, if such an application was filed within four years of the initial denial. 20 C.F.R. § 404.987.

There is no evidence in the record, nor has Navan alleged, that he ever requested a hearing before an ALJ to review the determination of his 1996 claim or that he filed a subsequent application for DIB within the four years following that determination.

### 2. *Current Application for DIB*

The application for DIB that forms the basis for the appeal before this court was filed on November 20, 2002 and, as in the previous application, alleged an onset date of November 9, 1994. This claim was denied both initially and on reconsideration, with an explanation that there was insufficient evidence to fully evaluate Navan's condition as of December 31, 1999, the date Navan's Title II insurance status expired. Tr. 53-55, 30.

On October 24, 2003, Navan requested a hearing to review the determination, and ALJ Dennis Katz held a hearing on September 1, 2005, at which attorney Max Leifer represented Navan. Tr. 57, 462-80. Navan and Dr. Leonard Langman both testified at the hearing that Navan had suffered a continuous impairment from back pain rendering him totally disabled since 1994. Tr. 465, 469-70.

On October 3, 2005, ALJ Katz issued his written decision denying Navan's claim for benefits under the Social Security Act. Tr. 14-25. Initially, ALJ Katz found that the May 12, 1997 denial of Navan's 1996 claim for DIB was a final judgment, which, under applicable rules of *res judicata*, precluded subsequent proceedings for DIB covering the same period of alleged disability, November 9, 1994 through May 12, 1997. Tr. 14-15 (citing 20 CFR § 404.957(c)(1)). Additionally, ALJ Katz noted that since more than four years had passed between the date that Navan's 1996 claim was denied, that case was not subject to being reopened. Tr. 15 (citing 20 CFR § 404.987(a); 20 CFR § 404.988(b)). As a consequence, ALJ Katz found that plaintiff's

9

disability status prior to May 13, 1997 was not subject to review and focused his inquiry on Navan's alleged disability for the period of May 13, 1997 to December 31, 1999. Tr. 15. After reviewing the evidence and testimony, ALJ Katz found that Navan did not meet the requirements for DIB during this time frame.

Navan requested a review of the ALJ's ruling by application of October 3, 2005, which the Appeals Council denied by notice of February 22, 2006. This action followed.

## II. Proceedings in this Court

Plaintiff's complaint was filed on April 7, 2006, within sixty days of the Appeals Council's denial of review. Defendant filed his motion to dismiss, Fed. R. Civ. P. 12(c), on October 16, 2006 and briefing concluded on March 15, 2007.

## III. Discussion

### A. *Standard of Review*

Judicial review of final decisions of the Commissioner of Social Security is provided by section 405(g) of Title 42 of the United States code. The district court does not conduct a *de novo* determination of whether a claimant is disabled. Townley v. Heckler 748 F.2d 109, 112 (2d Cir. 1984). The court will instead defer to the Commissioner's findings of fact where such findings are supported by substantial evidence. 42 U.S.C. § 405(g) ; Id. The Supreme Court has defined "substantial evidence" as meaning that a reasonable mind might accept the evidence as adequate to support the determination. Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir.1983)). Where the record contains inconsistent or contradictory

evidence, such that there is substantial evidence to support both the plaintiff's position and the Commissioner's decision, the court will affirm the Commissioner's decision. Gianotti v. Barnhart, No. 06 CIV. 909(SAS), 2001 WL 582755, at *5 (S.D.N.Y. Feb. 22, 2007) (citing Morilla v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This deferential standard however, does not apply to the Commissioner's rulings of law, which are reviewed *de novo*. Byam v. Barnhart 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley, 748 F.2d at 112).

### B. *Application of Res Judicata*

In order to avoid the burden of repeated claims for the same relief based on the same facts, the Social Security Act provides that any request for review of an adverse determination "must be filed within sixty days after notice of such decision is received by the individual making such request," 42 U.S.C.A. § 405(b)(1). The Act further provides that that failure to timely request review of an adverse determination on reconsideration may serve as the basis for the denial of a subsequent application.[12] The Commissioner of Social Security is empowered to make rules and regulations to carry out the Act's directive regarding subsequent applications. 42 U.S.C.A. § 405(a). These regulations authorize an ALJ to dismiss a hearing request entirely or to refuse to consider one or more issues when "[t]he doctrine of res judicata applies in that [the SSA or a state agency has] made a previous determination or decision … about [the claimant's rights] on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action." 20 C.F.R. § 404.957(c)(1). The regulations do however, permit the reopening of a decision which is otherwise final "within

---

[12] 42 U.S.C.A. § 405(b)(3)(A) provides that an applicant may avoid the preclusive consequences of an adverse determination only "if the applicant demonstrates that the applicant… failed to so request such a review acting in good faith reliance upon incorrect, incomplete, or misleading information, relating to the consequences of reapplying for benefits in lieu of seeking review of an adverse determination, provided by any officer or employee of the Social Security Administration or any State agency…"

11

12 months of the date of the notice of the initial determination, for any reason," and "within four years of the date of the notice of the initial determination if [the SSA] find[s] good cause." 20 C.F.R. § 404.988.

The letter notifying Navan that his 1996 DIB claim had been denied after initial review, and the letter notifying Navan of the subsequent denial upon reconsideration, both advised him that if he disagreed with the SSA's determination, he was required to file an appeal within 60 days and that, should he file a new application instead of appealing, he "might not qualify for any benefits" and a new application could be denied "using this decision, if the facts and issues [were] the same." Tr. 35, 44.  The record contains no evidence, nor has Navan offered any explanation, as to why he failed to exercise his right to request a hearing before an ALJ, as explained to him in the May 12, 1997 notice that his claim had been denied on reconsideration. Tr. 44.  Navan has likewise offered no explanation as to why he waited over five years to restate his claim of total disability for the period covered by the SSA determination, from November 9, 1994 to May 12, 1997.  Accordingly, by July 12 1997 the denial of Navan's 1996 application for DIB became a final determination that was no longer subject to reopening when Navan filed his second application for DIB in 2002.  Thus, ALJ Katz properly applied *res judicata* and Navan's claim for DIB for the ajudicatory period of November 9, 1994 to May 12, 1997.  Navan's claim that he was disabled within the meaning of the Social Security Act for this period is therefore dismissed.

### C. *ALJ's Determination of Navan's Disability During the Relevant Period*

*1. Requirements for Eligibility*

A claimant is entitled to DIB under the Social Security Act when, inter alia, such individual is "under a disability," defined as "the inability to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. §§ 423(a)(1)(E), 423(d)(2)(A).  A claimant is disabled under the act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Under the act, a claim for disability is evaluated in accordance with a five-step process. 20 C.F.R. § 404.1520.  The Second Circuit Court of Appeals has re-stated this five-step procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

E.g., Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).  In steps one through four it is the claimant's burden to show that his impairment was of a severity that prevented continuation of the claimant's previous work.  Butts v. Barnhart,  388 F.3d 377, 383 (2d Cir. 2004).  At step five, however, the burden shifts to the Commissioner to show that there is other available gainful work in the national economy that the claimant could perform. 20 C.F.R. § 404.1520(e); Id. Generally, the commissioner meets this burden by applying the vocational guidelines set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("the Grid"), to determine the claimant's residual functional capacity ("RFC"). Rosa, 168 F.3d at 78 (citing Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).   These guidelines, which take into account the "the claimant's residual functional

13

capacity in conjunction with the claimant's age, education and work experience," are generally dispositive in the determination of the claimant's disability unless the guidelines fail, in the particular case, to describe the full extent of the claimant's physical limitations.  Id. (citing Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996)); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, (1983) (upholding the promulgation of the Grid).

*2. ALJ's Determination that Navan was Not Disabled Between May 1997 and December 1999*

ALJ Katz properly concluded that the determination of Navan's 1996 claim for DIB was not subject to reopening in any subsequent claim for DIB filed after August 30, 2000.  The issue for the ALJ was if the severity of Navan's condition reached the eligibility threshold for disability between May 13, 1997 and December 31, 1999.  In making this evaluation, evidence of Navan's condition prior to May 13, 1997 was relevant, not for that period, but for the period subsequent to May 13, 1997.  While ALJ Katz conceded that the evidence suggested that, by 2005, Navan's condition might have reached a severity that rendered him totally disabled, he determined that Navan's condition had not reached that level during the period May 13, 1997 to December 31, 1999.  This determination is supported by substantial evidence.

Initially, the ALJ noted the absence of any medical records from the period of May 13, 1997 to December 31, 1999 that could support a finding that Navan's condition worsened during this time. Tr. 17.  Even the retrospective diagnosis provided by Dr. Langman failed to provide any support for a finding that Navan's condition substantially changed prior to the closing date of December 31, 1999, the date that Navan's Title II insurance expired.[13]  The ALJ found, further, that Navan's minimal efforts to obtain treatment in the roughly six years following his 1995 surgery were inconsistent with a claim that his condition significantly deteriorated during

---

[13] Quite to the contrary, Dr. Langman asserted that Navan's condition was totally disabling and had remained virtually unchanged since the 1992 accident.  Tr. 469-70. This contention is of course inconsistent with both the determination of Navan's 1996 DIB claim as well as the records indicating that Navan remained on the police force until October 1994.

14

this period. Tr. 17.  While plaintiff contends that he did not attempt to secure treatment in the belief that no successful treatment could be secured, he makes no attempt to reconcile this statement with the fact that, in August 2001, he began actively seeking and receiving medical treatment, including an aggressive series of corrective procedures performed between 2003 and 2005.  Tr. 293-305, 337-73.

ALJ Katz additionally found that Navan's medical records for the period of August 2001 to November 2002 suggested that Navan's condition had remained stable between May 13, 1997 and December 31, 1999.  Tr. 18-19.  The ALJ reasonably inferred from SWFPC's records that, as of 2001, Navan was still enjoying the curative effects of his 1995 surgery.  In his initial session with Dr. Valente at SWFPC on August 8, 2001, Navan reported that his pain level was "three" on a scale of one to ten and that his medication was "very effective in controlling breakthrough pain." Tr. 325.  November 2001 progress notes from Dr. Valente stated that Navan was seeing improvement from exercising with a universal weight machine and resultant weight loss. Tr. 323.   The reports from SWFPC also contradict plaintiff's assertion that he was unable to leave his house for the last eleven years, indicating that Navan returned to New York from Florida for two weeks in 2001, and for the summer in 2003. Tr. 310, 325.  Moreover, in an October 10, 2001 examination, Navan reported that his back pain was aggravated when he performed "yard work." Tr. 324.

Finally, ALJ Katz found that the evidence that *did show* a deterioration of Navan's condition demonstrated that such a deterioration did not occur until late 2002, well after Navan's Title II insurance had expired. Tr. 19.  First, SWFPC's records for Navan reflect a marked increase in Navan's pain levels near the end of 2002. Dr. Valente's progress note from December 24, 2002 shows Navan reporting pain levels at eight on a scale of ten, described as "constant throbbing" and aggravated by "anything." Tr. 314.  Second, Navan's medical records

15

from 2003 through 2005 clearly indicate that Navan's spinal condition materially worsened during this period. In February 2003, treating physician Dr. Gregory Flynn found that Navan's flexion of the lumbosacral spine had been reduced to twenty degrees, and that straight-leg raising ability had been diminished bilaterally to thirty degrees and forty-five degrees in the left and right legs respectively. Tr. 348. Dr. Flynn also reported previously unseen nerve root impingement. Tr. 343. In response to these findings, Dr. Flynn performed numerous diagnostic and corrective procedures on Navan over the next three years. Tr. 337-69, 411-28. But these conditions related to 2003 and afterwards and not to the period when he was covered by Title II insurance, December 31, 1999 and earlier. The determination of the ALJ was reasonably based.

## IV. Conclusion

After careful review of the entire record, and for the reasons stated, I hold that the Commissioner's finding, that Navan suffered from no limitation "of such severity that he [was] not only unable to do his previous work but [could not], considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy" as of December 31, 1999, 42 U.S.C. § 423(d)(2)(A), resulted from a proper application of the law and that it is supported by substantial evidence. Accordingly, I grant the Commissioner's Motion to Dismiss, Fed. R. Civ. P. 12(c), and dismiss the Complaint. The Clerk of the Court shall mark the case as closed.

SO ORDERED.

Dated: June **20**, 2007
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

16